868 So.2d 100 (2003)
Andrew Scott BEGUE
v.
CROSSOVER, INC. and Louisiana Workers' Compensation Corporation.
No. 2003 CA 0267.
Court of Appeal of Louisiana, First Circuit.
November 21, 2003.
*101 Dominick Bianca, Baton Rouge, for Plaintiff/Appellant, Andrew Scott Begue.
Merilla B. Miller, Baton Rouge, for Defendants/Appellees, Crossover, Inc. and Louisiana Workers' Compensation Corporation.
Before: WHIPPLE, KUHN and MCDONALD, JJ.
WHIPPLE, J.
In this workers' compensation dispute, plaintiff appeals the OWC judgment, denying him workers' compensation benefits on the basis that he did not suffer a work accident and that his medical condition did not constitute a compensable occupational disease. For the following reasons, we reverse and remand.

FACTS AND PROCEDURAL HISTORY
On July 16, 2000, Andrew Begue was re-hired and began working for Crossover, *102 Inc., a pipe manufacturer.[1] Initially, he worked as a saw operator, but in October or November of 2000, he was transferred to the shipping and receiving department where his position changed to hydrostatic pipe tester. As a pipe tester, Begue's function was to prepare pipes for shipping, which included de-burring pipes, cleaning the threads, hydrostatic testing of the pipes, painting the pipes with a spray gun, manually fitting caps on the ends of the pipes involving a cranking motion, stacking and banding pipes for shipment and moving the pipes into the yard for further transport. Upon being transferred to this position, Begue initially did not experience any problems with performing these job duties.
However, at some point in March of 2001, while driving a forklift on the facility grounds, which were described as "rough," Begue began experiencing a tingling sensation in his fingers. Over time, the tingling sensation spread upwards, and Begue's arms started tiring very quickly when he painted. By the end of March, Begue was experiencing pain in both hands. In April, the pain grew worse and spread into his shoulders. By this time, he also had to trade off hands while painting due to the fatigue in his arms. Begue was also experiencing pain moving down his legs into his feet. During this two-month period, Begue occasionally reported his discomfort to his supervisor, Harold Salisbury. Nonetheless, he continued to work.
Thereafter, on May 7, 2001, while preparing approximately 600 six-inch pipes for shipment, Begue developed an intense pain in his shoulders, which caused him to have difficulty lifting each pipe while working on it. According to Begue, the pain he experienced that day was different from the pain he had been experiencing since the day of the forklift incident in that it was noticeably more intense and constant. At that time, Begue reported to Salisbury that he was experiencing intense pain, and Salisbury responded that if the pain was not improved by the following day, he would refer Begue to a doctor.
When Begue returned to work the next day, he began working on the same six-inch pipes that he had worked on the previous day. However, his pain returned immediately, a pain which Begue described as "electricity going through my arm." Thus, Begue reported to Salisbury that he was experiencing shoulder, hand and elbow pain and a heaviness in his arms and that he needed to be seen by a doctor.
Begue then drove himself to North Oaks Rehabilitation Center, where he was examined by Dr. Mark Daunis. Dr. Daunis diagnosed bilateral shoulder strains and restricted Begue to light duty work. Begue returned to work on light duty status, but continued to experience pain. He returned to Dr. Daunis on May 15, 2001, at which time he underwent x-rays of the cervical spine. The x-rays indicated that Begue had relatively severe chronic degenerative disc disease at C4 through C7 and facet arthritis with moderate bilateral foraminal stenosis of the cervical spine. Dr. Daunis then referred Begue to Dr. B.J. Chiasson, an orthopedic surgeon.
Dr. Chiasson first examined Begue on May 22, 2001, at which time Begue was complaining of a significant amount of fatigue and pain in his neck and pain, numbness and tingling in both arms and legs. Dr. Chiasson also diagnosed cervical spinal stenosis, which he explained is a narrowing *103 of the holes where the nerves exit the spine that causes the nerves in the neck to be pinched. Dr. Chiasson likewise restricted Begue to light duty work, with no lifting of greater than five pounds.
On May 31, 2001, Dr. Chiasson restricted Begue completely from work until such time as he could review the results of diagnostic studies he had ordered. On the June 14, 2001 visit, Dr. Chiasson reviewed the results of the MRI and nerve conduction studies he had ordered. The cervical MRI confirmed the earlier diagnosis of moderate degenerative disc disease of the cervical spine and foraminal stenosis, and the nerve conduction studies revealed long-standing lumbosacral radiculopathy. Thus, in addition to cervical spinal stenosis, Dr. Chiasson also diagnosed long-standing nerve irritation of the lower back. At that point, he restricted Begue to sedentary work with no lifting.
Once Begue was restricted to sedentary work only, he was informed that Crossover did not have any work that he could perform. Although he had been unable to work since May 31, 2001, Louisiana Workers' Compensation Corporation (LWCC), Crossover's workers' compensation carrier refused to institute weekly indemnity benefits, contending it was investigating Begue's entitlement to such benefits at that time.[2]
With regard to treatment, Dr. Chiasson prescribed physical therapy for Begue, including cervical traction and epidural steroid injections. Additionally, because he believed Begue was a reasonable surgical candidate for the cervical stenosis, Dr. Chiasson suggested Begue be seen by a neurosurgeon for surgical evaluation. However, Begue did not seek or obtain the recommended surgical evaluation, but, instead, continued to seek treatment from Dr. Chiasson.
On the June 22, 2001 visit, Begue reported symptoms that Dr. Chiasson believed were consistent with bursitis of the shoulder, a soft tissue inflammation that causes discomfort with certain movements. The examination revealed impingement consistent with bursitis, and x-rays of the shoulders revealed some degenerative changes. At that point, Dr. Chiasson added the diagnosis of bilateral subacromial bursitis to his previous diagnoses, and he continued the same work restriction of sedentary work only.
By letter dated September 21, 2001, Dr. Chiasson reported to LWCC that Begue was suffering from "acute exacerbations" of both cervical spinal stenosis and bilateral subacromial bursitis. He further opined that the "acute exacerbations" of these conditions were work related. Nonetheless, by letter dated September 28, 2001, LWCC denied Begue workers' compensation benefits for his injuries, contending that "there was no unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently resulting in [his] injuries." Subsequently, on October 24, 2001, Begue's employment with Crossover was terminated.
On November 20, 2001, Begue filed a disputed claim for compensation, seeking weekly indemnity and medical benefits. Following trial, the workers' compensation judge dismissed Begue's claim, concluding that Begue had not sustained a work-related accident pursuant to LSA-R.S. 23:1021 and that he could not recover benefits for an occupational disease, because his ailments of cervical stenosis, bilateral subacromial bursitis and cervical degenerative disc disease were specifically excluded *104 from coverage pursuant to LSA-R.S. 23:1031.1(B).
From this judgment, Begue appeals, contending that the workers' compensation judge erred: (1) in finding that Begue had not suffered a work accident pursuant to LSA-R.S. 23:1021; and (2) in finding that the causes of Begue's disability are excluded from coverage pursuant to LSA-R.S. 23:1031.1(B). Accordingly, Begue seeks an award of weekly indemnity benefits, reimbursement of medical expenses as well as penalties and attorney's fees.

OCCURRENCE OF AN ACCIDENT

(Assignment of Error No. 1)
In order to be compensable under the workers' compensation laws, an injury must have resulted from an "accident arising out of and in the course of [an employee's] employment." LSA-R.S. 23:1031(A); Robin v. Schwegmann Giant Supermarkets, 93-2310, p. 4 (La.App. 1st Cir.11/10/94), 646 So.2d 1030, 1033, writ denied, 95-0202 (La.4/21/95), 653 So.2d 554. "Accident" is defined in LSA-R.S. 23:1021(1) as follows:
"Accident" means an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.
At the trial below, defendants argued, and the workers' compensation judge agreed, that Begue had failed to prove the occurrence of a specific "event" and that the degenerative conditions from which Begue suffers were simply gradual deteriorations, which are excluded from coverage under LSA-R.S. 23:1021(1) and also are specifically excluded as compensable occupational diseases.
While it is true that Dr. Chiasson diagnosed "acute exacerbations" of Begue's pre-existing cervical spinal stenosis and bilateral subacromial bursitis, the mere presence of a gradual or deteriorating condition does not preclude a claimant from recovering workers' compensation benefits. Jackson v. Savant Insurance Company, 96-1424, p. 7 (La.App. 1st Cir.5/9/97), 694 So.2d 1178, 1183. In Dyson v. State Employees Group Benefits Program, 610 So.2d 953, 955 (La.App. 1st Cir.1992), this court interpreted LSA-R.S. 23:1021(1) as amended in 1989 and concluded:
[A]n otherwise healthy employee with a preexisting condition is entitled to benefits if she can prove that her work contributed to, aggravated, or accelerated her injury. This is still the meaning of the last clause of section 1021(1), which requires that an injured employee be able to identify the event marking the time when one can identify an injury.
In Dyson, we specifically admonished against following cases which suggested that the amended section 1021(1) was meant to exclude from coverage persons who are worn down by their work rather than immediately crippled by it. As expounded in Dyson, such a view is inconsistent with the very purpose of the workers' compensation scheme. Dyson, 610 So.2d at 956.
Additionally, the Third Circuit Court of Appeal expounded even further in interpreting the amendments to 1021(1) as follows:
We must add our voices to those before us regarding the interpretation of "which is more than a gradual deterioration or progressive degeneration." Surely, this phrase does not relate to an injury which is clearly spurred by work activity, ... but only to non-work related *105 activities. For to interpret it otherwise, would lead to an absurd result as it would negate the very purpose for which the Worker's Compensation Act was instituted; namely, to provide relief to employees whose work has caused them injury and the inability to work.
Guilbeaux v. Martin Mills, Inc., 93-1359, p. 5 (La.App. 3rd Cir.5/4/94), 640 So.2d 472, 475, writ denied, 94-1444 (La.9/23/94), 642 So.2d 1291.
Additionally, the Fourth Circuit Court of Appeal has interpreted the language of LSA-R.S. 23:1021(1) that excludes from the definition of "accident" conditions caused by "a progressive deterioration or progressive degeneration," as follows:
The statute's emphasis on the occurrence of an "event" which is "precipitous" and which happens "suddenly or violently" and which event is "actual" and "identifiable" is instructive as to the meaning of the word "progressive" in the statute. Specifically, when the word "progressive" is read in the context of La. R.S. 23:1021(1) as a whole, it includes, not every increase in severity or extent of injury, but only those increases in extent or severity of injury which occur gradually over a period of time as opposed to increases in severity or extent which occur suddenly and to a marked degree.
Carter v. New Orleans Fire Department, 94-0338, p. 4 (La.App. 4th Cir.11/17/94), 646 So.2d 455, 459 (emphasis in original), writ granted on other grounds and remanded, 94-3072 (La.2/17/95), 650 So.2d 238.
Moreover, the Third Circuit Court of Appeal has noted that the identifiable, precipitous event may be a customary or routine work activity that results in an injury to an employee. Richard v. Workover & Completion, 2000-794, p. 4 (La.App. 3rd Cir.12/6/00), 774 So.2d 361, 364.
Thus, where the employee is able to identify an event marking the time the injury occurred or the symptoms arose or suddenly or markedly increased in severity, even if such event occurs during the performance of customary or routine work activities, the employee has established an "accident" within the meaning of LSA-R.S. 23:1021(1). See Dyson, 610 So.2d at 955-956; Carter, 94-0338 at p. 4, 646 So.2d at 459; Richard, 2000-794 at p. 4, 774 So.2d at 364.
In Dyson, the employee's job position changed, and under her new position, she was required to stand all day. Approximately one month after beginning the new job, the employee began experiencing light pain in her feet. About two months after the onset of the light pain in her feet, the employee felt very sharp pain "shoot" through her feet as she turned or pivoted to pick up a heavy bundle of papers. Dyson, 610 So.2d at 954.
The employee was later diagnosed with plantar fasciitis, a cumulative trauma disorder that is non-apparent until sufficiently aggravated by a situation such as prolonged standing. Based on this diagnosis, the employer argued that the employee suffered a gradual or progressive degeneration of her feet and that there was no actual, identifiable or precipitous event marking the development of her condition. Dyson, 610 So.2d at 954-955.
This court disagreed and affirmed the finding that the employee had suffered an accident within the meaning of LSA-R.S. 23:1021(1). Specifically, this court noted that even though the employee may have eventually reached the same point of disability without an identifiable, on-the-job injury, the pivoting movement the employee made with her feet which immediately preceded her pain constituted the identifiable *106 event that produced her injury. Dyson, 610 So.2d at 955-956.
Similarly, in Robin, the employee, a deli worker at a supermarket, was required to work alone in the deli for several days due to the illness of two other employees. The employee was required to lift meats and cheeses weighing ten to twenty pounds and to stock items weighing forty-five to sixty pounds, and during the time that she worked alone, her back began hurting. Robin, 93-2310 at pp. 2-3, 646 So.2d at 1032.
On the last day that she worked alone, her back was hurting very badly by the end of her shift, and during the night after her shift, the employee reported to the local emergency room with severe back pain. Robin, 93-2310 at p. 3, 646 So.2d at 1032. The employee was subsequently diagnosed with a pre-existing cumulative trauma disorder of the lumbar spine which had been aggravated to such a degree that it caused a ruptured lumbar disc. The employer argued that the employee had failed to prove the occurrence of an "event" and that the herniated disc was simply a gradual deterioration which is excluded from coverage under LSA-R.S. 23:1021(1). Robin, 93-2310 at pp. 4, 5, 646 So.2d at 1033.
In affirming the award of benefits, this court noted that while the employee had experienced back pain throughout the time she was required to work alone, she had also testified that the pain she experienced the night after her last day of work was a different kind of pain than what she had felt before. This court further found that the employee's testimony was consistent with the doctor's explanation that her work duties resulted in continuous micro-traumas and cumulated in a ruptured disc. Thus, this court concluded that under those circumstances, the "event" which resulted in the employee's injury consisted of the lifting duties she performed on her last day of work. Robin, 93-2310 at p. 6, 646 So.2d at 1034.
In Jackson, an employee truck driver began experiencing a tingling in his arms while attempting to hold the steering wheel of his truck straight as it was being pulled through the mud by a bulldozer. However, assuming that the pain would go away as it had in the past, the employee continued working. Jackson, 96-1424 at pp. 2, 9, 694 So.2d at 1179, 1184. When he later sought treatment for the pain, he reported to the physician that he had experienced a "slow, gradual onset" of these problems and did not refer to any particular event giving rise to his symptoms. Jackson, 96-1424 at p. 4, 694 So.2d at 1180. The employee was diagnosed with chronic, degenerative rotator cuff disease; however, his physician noted that something could have occurred to aggravate this condition. Jackson, 96-1424 at p. 4, 694 So.2d at 1181.
Rejecting the employer's argument that the employee suffered from a gradual deterioration and, thus, could not prove the occurrence of an accident as defined in LSA-R.S. 23:1021(1), the workers' compensation judge found that the employee had a pre-existing condition that was aggravated by the work accident. Jackson, 96-1424 at p. 4, 694 So.2d at 1181. In affirming that finding, this court noted that the employee had identified the event constituting an accident, namely, the attempt to hold the steering wheel of the cement truck while a bulldozer pulled it backwards. Jackson, 96-1424 at p. 8, 694 So.2d at 1183.
In the instant case, the workers' compensation judge found that, based on Begue's "own admission," no accident had occurred within the meaning of LSA-R.S. 23:1021(1). We disagree. It is true that Begue testified that he did not have an *107 "accident" at Crossover on May 7 or 8, 2001. He explained that he considered an "accident" to be an incident where something would fall on him or physically hit him, and candidly stated that nothing like that had occurred.[3] Nonetheless, Begue was clearly able to identify specific events at work that led first to the onset of symptoms and then, subsequently, to the sudden, marked increase in his symptoms as he attempted to continue to perform his work activities.
Specifically, Begue first began experiencing symptoms of tingling in his hands one day in March 2001, while driving a forklift at work over rough terrain. Indeed, Begue testified that "the whole process started while I was driving a forklift." Believing that he had simply been gripping the steering wheel too tightly, Begue continued to work at that point. However, the symptoms persisted and increased until eventually, on May 7, 2001, Begue experienced a sudden and marked increase in his symptoms of pain and tiredness in his arms while preparing a large order of pipes for shipment. This event, which triggered an aggravation of Begue's pre-existing cervical spinal stenosis and bilateral subacromial bursitis, clearly constitutes an "accident" within the meaning of LSA-R.S. 23:1021(1) and the controlling jurisprudence interpreting the statute.[4] Thus, despite Begue's candid admission that he had not sustained an accident in the sense of the occurrence of a traumatic event, we conclude that the workers' compensation judge erred in concluding that the events related by Begue did not constitute an "accident" within the meaning of LSA-R.S. 23:1021(1).
Because we have found merit to Begue's first assignment of error and have concluded that he did in fact prove that he sustained an accident within the meaning of LSA-R.S. 23:1021(1), we pretermit discussion of his second assignment of error, in which he argues that the workers' compensation judge erred in finding that his disability was excluded from coverage pursuant to LSA-R.S. 23:1031.1(B), where Begue had not asserted that his disability had resulted from an occupational disease.

AWARD OF BENEFITS
Because we have concluded that the workers' compensation judge erred in failing to find that Begue had suffered a work accident that aggravated his pre-existing conditions of cervical spinal stenosis and bilateral subacromial bursitis, we likewise conclude that the workers' compensation judge erred in failing to award Begue weekly indemnity benefits and reimbursement of medical expenses related to these conditions.
An employee is entitled to temporary total disability benefits pursuant to LSA-R.S. 23:1221(1)(c) if he proves by clear and convincing evidence that he is physically unable to engage in any employment. Collins v. Family Dollar Stores, Inc., 99-0622, p. 6 (La.App. 1st Cir.5/12/00), 760 So.2d 1210, 1214, writs denied, 2000-2356, 2000-2363 (La.11/13/00), 773 So.2d 727. However, even an employee who can perform only *108 sedentary work is not entitled to temporary total disability benefits. Boutte v. Langston Companies, Inc., 97-972, p.6 (La.App. 3rd Cir.2/4/98), 707 So.2d 1315, 1319. On the other hand, pursuant to LSA-R.S. 23:1221(3)(a), an employee is entitled to supplemental earnings benefits if he proves by a preponderance of the evidence that he sustained a work-related injury that results in his inability to earn 90% of his pre-injury wages. Vicknair v. Nature Conservancy, 97-2229, p. 3 (La. App. 1st Cir.6/29/98), 718 So.2d 476, 478, writ denied, 98-2495 (La.11/25/98), 729 So.2d 567.
The record before us demonstrates that the tasks which Begue was required to perform as a hydrostatic pipe tester ranged from medium duty to heavy duty work. However, commencing May 8, 2001, Begue was restricted to either light duty, no work or sedentary work. While Crossover offered Begue light duty work, it was unable to offer him any work once Begue was restricted to sedentary work on June 14, 2001.
But we note that Begue additionally testified that it was his understanding that toward the end of June 2001, he was completely restricted from work, although it is unclear which of his medical providers restricted him from work in this manner. Also, according to Begue, Dr. Chiasson released him to return to work with certain lifting restrictions in January of 2002, at his request, because of financial difficulties. Despite this release to return to work, he nonetheless testified at the October 28, 2002 hearing that he still was not working because of the pain he was experiencing throughout his body. Additionally, the record indicates that Begue received unemployment benefits during some of the time that he was restricted from work, for which Crossover claims a credit.
Considering the record before us, we conclude that we must remand this matter to the workers' compensation judge for a determination of the type, amount and duration of indemnity benefits to which Begue is entitled, together with any credits to which Crossover may be due. LSA-C.C.P. art. 2164.
Additionally, with regard to medical benefits, Begue is entitled to reimbursement for all reasonable and necessary expenses incurred in relation to the aggravation of his pre-existing conditions of cervical spinal stenosis and bilateral subacromial bursitis. LSA-R.S. 23:1203; Collins, 99-0622 at p. 10, 760 So.2d at 1217. However, we note that Begue also received treatment for a mass that was discovered on his thyroid during the treatment of his work-related injuries. Having failed to prove any causal connection between the thyroid mass and his work accident, Begue is not entitled to reimbursement for expenses related to treatment of his thyroid condition. On the record before us, we are unable to determine the precise amount of reimbursement to which Begue is entitled for reasonable and necessary medical expenses incurred; thus, we must remand for a determination of that award also. LSA-C.C.P. art. 2164; see also Dyson, 610 So.2d at 956.

PENALTIES AND ATTORNEY'S FEES
Begue also requests that this court render an award of penalties and attorney's fees to him, asserting that Crossover was arbitrary and capricious in denying him benefits and had no reasonable basis to controvert his claim.
Pursuant to LSA-R.S. 23:1201(F), an employee is entitled to an award of both penalties and attorney's fees if the employer or insurer fails to commence payments of benefits timely or to *109 pay continued installments timely (or to pay medical benefits timely) unless the claim is reasonably controverted. Conversely, pursuant to LSA-R.S. 23:1201.2, the employee is entitled to an award of only attorney's fees where the employer or insurer arbitrarily discontinues payment of benefits due. Williams v. Rush Masonry, Inc., 98-2271, p. 7 (La.6/29/99), 737 So.2d 41, 45.
In this case, LWCC initially paid some medical benefits to Begue while the claim was under investigation, which it later discontinued, but never paid any weekly indemnity benefits. Nonetheless, we conclude that Begue has not established his entitlement to penalties or attorney's fees. Although we ultimately concluded that Crossover's and LWCC's argument as to the non-existence of an accident lacked merit, we cannot say that their refusal to pay or continue payment of benefits was arbitrary or that the claim was not reasonably controverted. Although he explained at trial that he had not listed an accident because of his understanding of what an "accident" means, we cannot say that the employer or insurer acted unreasonably in disputing his claim. See Seal v. Gaylord Container Corporation, 97-0688, p. 12 (La.12/02/97), 704 So.2d 1161, 1168. Thus, we decline to render an award of penalties or attorney's fees.

CONCLUSION
For the above and foregoing reasons, the November 12, 2002 judgment, dismissing Begue's claim for workers' compensation benefits with prejudice is reversed. This matter is remanded to the Office of Workers' Compensation for further proceedings consistent with the views expressed herein, including rendition of a specific award of weekly indemnity benefits and reimbursement of medical expenses incurred. The workers' compensation judge is further ordered to conduct such proceedings preferentially and to render judgment accordingly. Costs of this appeal are assessed against defendants, Crossover, Inc. and Louisiana Workers' Compensation Corporation.
REVERSED AND REMANDED WITH ORDER.
KUHN, J., concurs with reasons.
MCDONALD, J., dissents.
KUHN, J., concurring.
I write separately to note that despite the plain language of La. R.S. 23:1021(1) defining an accident as "an ... event ... directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration," the jurisprudence nevertheless eclipses the apparent attempt of the legislature to exclude from the ambit of the Workers' Compensation Act "wear and tear" injuries.[1]
According to relevant jurisprudence:
In order for a claimant to be entitled to recover workers' compensation benefits, he must establish by a preponderance of evidence that an accident occurred on the job site and that an injury was sustained. A worker's testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. The evidence is to be viewed *110 in a light most favorable to the claimant. When there is proof of an accident and of a following disability, without an intervening cause, it is presumed that the accident caused the disability.
Sanders v. Grace Nursing Home, 98-1344, p. 3 (La.App. 1st Cir.9/24/99), 754 So.2d 1024, 1026 (citing Jackson v. Savant Ins. Co., 96-1424, p. 3 (La.App. 1st Cir.5/9/97), 694 So.2d 1178, 1180).
I believe that in this case the OWC determination of no accident can be supported by an implicit finding that Begue's symptomatic spinal stenosis and bilateral subacromial bursitis were injuries that were simply gradual deteriorations or progressive degenerations of his spine and shoulders.
But duty bound by the jurisprudence and viewing the evidence in a light most favorable to the worker, the record establishes that Begue's testimony alone discharged his burden of proof. Defendants presented no other evidence that discredited or cast serious doubts on Begue's testimony about when the onset of pain occurred or suggested an intervening cause. Indeed, it was not a disputed fact that the operation of the forklift over a rough surface in the work yard during March was the triggering mechanism that led to the onset of Begue's symptoms. Moreover, the record is devoid of any medical evidence of examinations or treatment related to his cervical spine or shoulders for over the seven years preceding his May 2001 complaints. The record additionally shows that Begue's testimony is corroborated by the circumstances following the forklift operation. While Begue was not absent from work during the four months prior to the onset of the more intense, constant pain of May 7th and 8th, subsequently, he sought medical treatment on a regular basis.
OWC provided little insight into its reasoning. In the judgment, OWC stated only that "by Employee's own admission, which is supported by other evidence, [he] did not sustain a work related accident...." But as suggested in the primary opinion, Begue's explanation of what he believes an accident to be does not describe exclusive criteria by which the legal standard of "an accident" for purposes of Workers' Compensation recovery is measured. A thorough review of the record provides no basis to conclude that OWC evaluated witness credibility and found other witnesses to be more credible than Begue or otherwise rejected Begue's testimony. And insofar as the finding that the onset of his pain commenced with the forklift operations in early March and persistently continued until May when he experienced pain that was different and noticeably more intense and constant, the record provides no testimonial or documentary evidence setting forth a different version. Thus, in light of the jurisprudencedespite the plain language of La. R.S. 23:1021 and accepting the proposition that this court does not and should not make policy decisionsI must concur in the result.
NOTES
[1] Begue had previously worked for Crossover from approximately October 1996 to May 1999.
[2] LWCC did pay some medical benefits while the claim was under investigation.
[3] For this reason, Begue had related to Dr. Chiasson that he had not sustained an "accident" at work.
[4] With regard to causation, Dr. Chiasson testified that repetitive activities such as lifting pipes waist high or shoulder high, moving them and setting them down, and using a crank handle, could cause asymptomatic conditions of bursitis and cervical spinal stenosis to become symptomatic. Additionally, given Begue's history of being asymptomatic prior to the events in question, Dr. Chiasson opined that the aggravation of Begue's pre-existing conditions was work-related.
[1] See H. Alston Johnson, III, Workers' Compensation Law and Practice, § 216, p. 453 in 13 Louisiana Civil Law Treatise (4th ed.2002).